James E. ATOMANCZYK, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–86–00546–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

Aug. 24, 1989.

John F. Carrigan, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., J. Harvey Hudson, Asst. Dist. Atty., Houston, for appellee.

Before EVANS, C.J., and DUGGAN and O'CONNER, JJ.

## OPINION ON REMAND

EVANS, Chief Justice.

A jury convicted appellant of murder and assessed his punishment at confinement for life and a fine of $10,000. In his appeal, appellant asserted that the parole charge given to the jury, pursuant to Tex.Code Crim.P.Ann. art. 37.07, sec. 4,[1] violated the Texas Constitution. In an unpublished opinion issued on April 2, 1987, this Court upheld the constitutionality of the statute and overruled these points of error. The Texas Court of Criminal Appeals has vacated the judgment of this Court and remanded the cause to this Court for further consideration.

In his first six points of error, appellant contends the trial court erred in instructing the jury on the issue of parole. Since this Court's earlier disposition of the case, the Texas Court of Criminal Appeals has ruled the parole statute is unconstitutional. *Rose v. State,* 752 S.W.2d 529 (Tex.Crim. App.1988).

In *Rose,* the Texas Court of Criminal Appeals held that article 37.07, section 4 violated the separation of powers and the due course of law provisions of the Texas Constitution. *Rose,* 752 S.W.2d at 552. On its own motion for rehearing, the court then held that when the trial court gives a parole charge, the appellate court must apply the rule 81(b)(2) test to determine whether appellant was harmed. *Rose,* 752 S.W.2d at 553; Tex.R.App.P. 81(b)(2). That rule provides:

> If the appellate record in a criminal case reveals error in the proceedings below,

1. Ch. 576, sec. 1, 1985 Tex.Gen.Laws 2195, *amended by* ch. 66, sec. 1, 1987 Tex.Gen.Laws 170, *amended by* ch. 1101, sec. 15, 1987 Tex.Gen. Laws 3765.

the appellate court shall reverse the judgment under review, unless the appellate court determines beyond a reasonable doubt that the error made no contribution to the conviction or to the punishment.

In making its assessment of harm in *Rose*, the court pointed to a number of different factors in finding the error made no contribution to the punishment assessed: a curative charge given to the jury; the egregious facts of the case; and the defendant's criminal record. *Rose*, 752 S.W.2d at 554–555. The jury convicted Rose of aggravated robbery and assessed the maximum sentence of life imprisonment.

We turn to the facts of this case. In its charge to the jury, the trial court gave the following statutory charge:

> You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant.

*Compare Rose*, 752 S.W.2d at 554. As noted in *Rose*, we generally presume a jury follows the instructions given by the trial court. *Cobarrubio v. State*, 675 S.W.2d 749, 752 (Tex.Crim.App.1983). Although the court did not give the additional curative charge referred to in *Rose*, we conclude that the statutory charge adequately instructed the jury it was not to consider the manner in which the parole law might be applied to appellant. Appellant has not presented any evidence that rebuts the presumption that the jury followed the court's charge.

The facts of the murder show that it was senseless and brutal. The victim's wife testified that she and her husband were asleep in their home when someone knocked on the door about 2 or 3 a.m. They went to the window by the door and saw appellant standing on the front porch under the porchlight. Neither of them knew him. After appellant continued knocking, her husband opened the door.

Appellant asked for someone named John. The victim, with his wife standing behind him, told appellant that no one named John lived there. Appellant then took a .38 caliber pistol from his jacket, held it within 24 inches of the victim's face, and pulled the trigger. The victim fell to the floor, blood flowing from his mouth, and died in his wife's arms. Appellant fled the scene and was apprehended 10 months later when the victim's wife identified his picture from a photo array shown to her by the police. A nurse, who had lived with appellant after the victim's murder, testified that appellant owned and knew how to use a .38 caliber revolver. She said appellant told her he had used the gun to shoot someone in the head, saying "I blow people's heads off."

At the punishment phase, the State presented evidence that a jury had previously convicted appellant of attempted capital murder and had assessed punishment at 85 years confinement. Because the indictment alleged no enhancements, the trial court instructed the jury to consider the full range of punishment, five to 99 years or life and a maximum fine of $10,000. In closing arguments, the prosecution asked the jury to assess the maximum punishment. The defense counsel asked the jury to consider the entire range of punishment and be reasonable in light of his other sentence. In his argument, the defense counsel made the following remark regarding parole:

> All I'm saying, he's gone, I don't know how long, but a long time. Read this Charge. He's got to serve at least a third of any time and be rehabilitated and he's gone, got to be in shape to get out. I don't know if he'll ever get in shape. The State of Texas may have to care for him until he dies. Is it reasonable to give a huge, long sentence under these circumstances, knowing what each of us now knows [that he is serving an 85–year sentence]? So, simply, I'm asking you, be reasonable in assessing a sentence.

The prosecutor made no mention of parole

during his argument.[2]

The jury deliberated for almost one hour and assessed punishment at confinement for life and a fine of $10,000.

■ In light of the factors considered in *Rose*, we find beyond a reasonable doubt that the parole charge did not contribute to the punishment assessed. The facts show that appellant shot the victim from close range without any apparent motive. The State also introduced evidence of appellant's conviction for attempted capital murder, this second offense occurring within one year of the charged offense. These egregious facts amply justify the jury's assessment of punishment. In view of the statutory charge given by the court, and the absence of any prosecutorial emphasis on parole, we conclude beyond a reasonable doubt that a rational trier of facts would not have reached a different result if the parole charge had not been given. *See Harris v. State*, No. 69,366 (Tex.Crim.App., June 28, 1989) (not yet reported).

Having decided that appellant's first six points of error, which were remanded to this Court for reconsideration in the light of *Rose*, should be overruled, we are inclined to affirm the trial court's judgment. However, because the dissenting opinion disagrees, not only with our decision on the *Rose* issues, but also with the court's earlier opinion regarding appellant's competence to stand trial and his sanity at the time of the crime, we have decided to reconsider those issues, even though they were not specifically included in the order of remand. *See Adkins v. State*, 764 S.W.2d 782, 784 (Tex.Crim.App.1988). Having reconsidered these issues in the light of the appellate record before us, we remain of the opinion that both questions were correctly decided by this Court's earlier opinion.

The record shows that appellant has a mental disorder, diagnosed as chronic, paranoid-type schizophrenia. Because of the severity of that illness in October 1983, he was found incompetent to stand trial and was hospitalized for treatment at Rusk State Hospital. In November 1984, he was again found incompetent to stand trial and was hospitalized a second time at Rusk State Hospital for an indefinite period. On January 24, 1986, the clinical director at Rusk State Hospital advised the trial court that appellant was competent to stand trial and that the court could resume the criminal action pending against him.

On March 5, 1986, the trial court granted a joint motion for psychiatric examination of appellant to determine his competency and sanity. In a report dated March 12, 1986, Dr. Jerome B. Brown, a clinical psychologist at the Mental Health and Mental Retardation Authority of Harris County, stated to the court that, in his opinion, appellant should be considered of sound mind at the time of the alleged offense, and that the deterioration in his psychological function came only after his arrest and incarceration, approximately 10 months later. In a separate report, also dated March 12, 1986, Dr. Brown advised the court that, in his opinion, appellant should be considered competent to stand trial. Dr. Brown reported that, while appellant was still suspicious and believed he had been mistreated at the hands of the criminal justice system, he was able to consult with his attorney with a reasonable degree of rational understanding "if he decides to do so." Dr. Brown noted that appellant's prescription from Rusk State Hospital had expired, and that he was no longer receiving medication.

The court also received another report dated March 12, 1986, from Dr. John D. Nottingham, Jr., a psychiatrist at the Mental Health and Mental Retardation Authori-

**2.** Counsel's arguments to the jury about the effect of the parole laws on a defendant's incarceration may constitute a significant factor in considering whether the court's parole charge could have contributed to the punishment assessed. *See Urbano v. State,* 760 S.W.2d 33, 39 (Tex.App.—Houston [1st Dist.] 1988, pet. pend-ing); distinguished in *Villanueva v. State,* 769 S.W.2d 678 (Tex.App.—Houston [1st Dist.], 1989, n.p.h.). But each case must be analyzed on its individual facts, and we do not consider defense counsel's remarks so significant as to rebut the presumption that the jury followed the court's curative instruction.

ty. Dr. Nottingham stated that, in his opinion, appellant was legally sane at the time of the alleged offense.

On May 8, 1986, the State and appellant's counsel agreed to a July 8, 1986 trial setting. On July 2, 1986, appellant's counsel filed a notice that he planned to invoke the defense of insanity. On July 8, 1986, the day before trial commenced, appellant's counsel filed a motion to have an independent psychiatric examination of appellant, which the court granted that same day. Appellant also filed an unsworn motion for a continuance to permit the psychiatric examination to be accomplished, but there is no showing that this motion was ever presented to the trial court for a ruling. Appellant made no complaint in the trial court, and makes no complaint on this appeal, that the court abused its discretion in proceeding to trial on July 9, 1986. Indeed, the record does not show that the trial court was ever made aware of the appellant's unsworn motion for continuance, and unless that motion was presented to the court for a ruling, there could be no error. Thus, we need not consider the question, raised only by the dissent, that the trial court was required to consider the unsworn allegations in the motion as raising an issue on appellant's competency to stand trial. *See* Tex.R.App.P. 52(a); *Johnson v. State,* 504 S.W.2d 493, 494 (Tex.Crim.App. 1974).

At appellant's arraignment on July 9, 1986, his trial counsel questioned him at length about his understanding of plea bargain negotiations with the State's prosecutor, and about counsel's recommendations to him. During this questioning, appellant's counsel had considerable difficulty in obtaining appellant's response to his questions about the plea bargaining negotiations.[3] Appellant's counsel finally asked appellant whether he wished to accept the State's offer, or whether he wished to go to trial. When appellant did not respond to that question, the court entered a plea of not guilty on his behalf, and the case proceeded to trial. Not once during the course

of the trial that followed did appellant's counsel ever assert his belief that appellant was mentally incompetent to assist in his own defense.

During the guilt-innocence phase of trial, after the State rested its case, appellant's counsel called Dr. Fred Fason, an independent psychiatrist, who had been appointed by the court to examine appellant. Dr. Fason stated that he diagnosed appellant's mental disorder as "schizophrenic, paranoid-type chronic," but he said he had no opinion as to whether appellant was mentally insane at the time of the offense. He said he could not form a conclusion about that issue because he did not have sufficient data to do so. He said he had examined appellant for only 15 minutes that morning. He said it was "possible" that appellant was insane at that time, but he said it was equally possible that appellant was sane.

Dr. Fason testified, in effect, that he had no opinion about appellant's sanity at the time of the offense, and that he did not disagree with the conclusion expressed by Dr. Brown and Dr. Nottingham that appellant was legally sane at that time. He also conceded that just because a person had committed an apparently senseless criminal act, the commission of the act did not mean that the person was insane. Never once during his direct or cross-examination was Dr. Fason asked if he had an opinion about appellant's competence to stand trial. Thus, Dr. Fason expressed no opinion on that matter.

The only evidence presented to the court regarding appellant's competency to stand trial and his sanity at the time of the offense consisted of the two psychiatric evaluations by Dr. Brown and Dr. Nottingham. Dr. Fason testified that he had reviewed both reports and that he had no substantial disagreement with the conclusions reached. Indeed, he quoted at length from Dr. Nottingham's report, said he had read it, and agreed with it. Dr. Fason admitted he was unable to reach any conclusion about appellant's sanity at the time of the offense, and as stated earlier, he

---

**3.** The record does not indicate whether appellant's lack of response was due to his inability to comprehend, or if he simply refused to communicate. The trial court was, of course, in a better position than we are to make such an assessment.

was never asked if he considered appellant competent to stand trial. Thus, Dr. Fason's testimony did not raise any issue of fact regarding appellant's competency to stand trial or his sanity at the time of the offense.

Based on the evidence presented, the court, at the conclusion of trial, entered the following order:

It is the finding of this court that the defendant at an earlier time has been found incompetent to stand trial by a jury and was sent to Rusk State Hospital for further evaluation and treatment. It is the further finding of this court that the defendant was returned to Harris County, Texas, after regaining competency and appeared before this court accompanied by letters from Physicians at Rusk State Hospital stating he had regained competency.

Further, it is the finding of this court that the defendant was evaluated by Physicians in Houston, Texas, and their letters and opinions stating defendant's competency were presented to the court before commencement of trial.

It is the order of this court that defendant, John Edward Atomanczyk, prior to the commencement of trial, was competent to stand trial.

In determining whether "there is evidence to support a finding of incompetency to stand trial," a trial court must consider only that evidence tending to show incompetency and put aside "all competing indications of competency." *Sisco v. State,* 599 S.W.2d 607, 613 (Tex.Crim.App.1980). Here, the only evidence relating to the issue of competency was that contained in the psychiatric reports of Dr. Brown and Dr. Nottingham. Although some of the factors analyzed in these reports might suggest appellant had a mental disorder, these factors cannot be considered alone and without reference to the doctor's medical conclusion. The reports show that both doctors reached the same medical conclusion: appellant was then competent to stand trial. This medical conclusion was never refuted by any evidence, and the reports do not reflect "competing indica-

tions of competency" within the meaning of *Sisco.*

In this Court's earlier opinion, we determined that no evidence was presented to the trial court raising an issue about appellant's competency to stand trial, or that required the court to instruct the jury on appellant's claimed insanity at the time of the offense. On remand, having again reviewed the record, we find no basis for disturbing this Court's decision on these same issues.

The trial court's judgment is affirmed.

O'CONNOR, J., dissents.

O'CONNOR, Justice, dissenting.

Appellant claims he was not competent to stand trial. He says he could not understand the proceedings against him, he could not consult with his counsel, and he could not help prepare his defense. If true, the State could not put him to trial on criminal charges. *Drope v. Missouri,* 420 U.S. 162, 172, 95 S.Ct. 896, 904, 43 L.Ed.2d 103 (1975). Our adversary system of justice insists that a defendant be competent at trial. *Id.* To convict a defendant while he is legally incompetent violates his rights to due process and due course of law. *Ex parte Lewis,* 587 S.W.2d 697, 700 (Tex. Crim.App.1979).

Appellant's points of error present three issues for resolution: (1) Should the trial court have held a jury hearing on appellant's competence to stand trial? (2) Should the trial court have submitted the defensive issue of insanity at the time of the crime? (3) Should we order a re-trial of the punishment because of the error in the parole instruction?

The majority holds there was no evidence that raised the issue of appellant's trial-time incompetence, there was no evidence that raised the issue of his crime-time insanity, and the parole charge did not harm him. I respectfully disagree.

## I. SHOULD THE TRIAL COURT HAVE HELD A JURY HEARING ON APPELLANT'S TRIAL–TIME COMPETENCE?

When the trial court decides whether to hold a jury trial on trial-time competence, the court must consider only the evidence of incompetence and must ignore all evi-

dence that tends to show competence. *Sisco v. State*, 599 S.W.2d 607, 613 (Tex.Crim. App.1980). When the majority here decides there is no evidence of appellant's trial-time incompetence, the majority considers evidence the Court of Criminal Appeals told us to ignore and ignores evidence the Court of Criminal Appeals told us to consider. The majority refuses to apply the *Sisco* standard of review.

## A. APPELLANT'S COMPETENCE TO STAND TRIAL

Appellant, a chronic paranoid schizophrenic, was twice committed to Rusk State Hospital. At the first hearing, in October of 1983, the State introduced a medical report that said appellant was schizophrenic, a severe mental illness. After the jury found appellant was incompetent to stand trial, the trial court committed appellant to Rusk for not more than 18 months under the criminal commitment provision. Tex.Code Crim.P.Ann. art. 46.-02, § 5(a) (Vernon 1979). On November 30, 1984, the court held a second commitment hearing on competence. At that hearing, the State introduced medical records that showed appellant's schizophrenia was not yet responding to medication. After the jury found appellant incompetent to stand trial a second time, the trial court committed appellant to Rusk indefinitely, under the civil commitment provision. Tex.Code Crim.P.Ann. art. 46.02, § 6(b)(6) (Vernon 1979).

On January 24, 1986, Dr. James Hunter, the Clinical Director of Rusk, informed the trial court that appellant was competent to stand trial and the court could resume the criminal proceedings. A summary of the report that accompanied appellant's discharge said appellant was neat and well kempt, coherent, withdrawn with a flat affect, hearing voices off and on, verbalizing no paranoid or delusional thinking, and was taking 200 mg of Mellarill a day. The report diagnosed appellant as a "chronic paranoid schizophrenic," and said his prognosis was "guarded."

On March 5, 1986, the trial court granted a joint motion for psychiatric examinations to determine appellant's trial-time competence. The court ordered the Harris County Forensic Psychiatric Services (HCFPS) to conduct psychiatric examinations to determine competence and sanity and to file the reports with the court by April 16, 1986.

In a report filed on April 1, 1986 (dated March 12, 1986), Dr. Jerome Brown, a psychologist with the HCFPS, found appellant was competent to stand trial. Dr. Brown described appellant as poorly groomed, with noticeable body odor, and said he seemed "quite nervous and fidgety and occasionally had trouble grasping the right word." Dr. Brown noted that appellant's prescription of medicine from Rusk had run out, and he was no longer receiving medication.

A second report from HCFPS, ordered by the court to be filed by April 16, was filed on July 11, after the trial. In the report, Dr. John Nottingham said appellant was competent to stand trial. Dr. Nottingham noted that appellant told him he had run out of medication a week before and had no medicine while in the Harris County Jail (the report was dated March 12, 1986). Dr. Nottingham warned that appellant's competence could deteriorate if his medication was not resumed. The record does not show if appellant received any medication after March 12, 1986.

On July 2, 1986, appellant filed a notice that he planned to invoke the defense of insanity. On July 8, 1986, appellant filed a motion for an independent psychiatric examination and an unsworn motion for continuance for a psychiatric examination. In the motion for continuance, defense counsel said appellant could not testify in his own behalf, comprehend the charges against him, or aid in his defense. Defense counsel opined that the reason appellant was incompetent and unable to assist in his defense was that he was over-medicated. The court granted the motion for independent psychiatric examination. There is no order in the record on the motion for continuance.

The trial on the merits began on July 9, 1986, the day after the court granted the motion for an independent psychiatric examination. Dr. Fred Fason, the doctor appointed to examine appellant, talked to ap-

pellant for 15 minutes in the courtroom before the trial started.

After the court impaneled the jury, but before starting the trial, the court permitted defense counsel to present evidence that he recommended appellant accept the State's plea bargain offer. The State offered to recommend a sentence equivalent to the time appellant had already served in jail in return for a plea of no contest. At that hearing, appellant did not seem able to understand the State's offer or the result of refusing it. In response to 13 different questions whether he understood the offer, appellant either said "no" or made no response. The trial court entered a plea of not guilty for appellant and began the trial.

On July 10, 1986, the jury returned a guilty verdict and assessed punishment. On July 11, the trial court entered a post-trial order declaring appellant was competent to stand trial before the trial began.

## B. HOW DOES THE TRIAL COURT DECIDE WHETHER TO HOLD A JURY TRIAL ON COMPETENCE?

In *Sisco*, the court settled the issue of how the trial court must respond when a defendant claims he is not competent to stand trial. In deciding whether the trial court should submit the issue of competence to the jury, the *Sisco* court said,

the Legislature intended only that there be evidence sufficient to raise the issue rather than to support a final determination of incompetency.

*Sisco v. State*, 599 S.W.2d at 612 n. 13. In effect, the court said there are two issues on competence. First, for the trial court: Is there *any evidence* that raises the issue of defendant's incompetence? The second, for the jury: Is there *enough evidence* to find defendant incompetent to stand trial?

To determine if the trial court should submit the issue of competence to the jury, the *Sisco* court told the trial court to assay just the evidence of incompetence, putting aside all other evidence. After excluding the evidence of defendant's competence, the trial court was to see if there was some evidence, a quantity of more than none (or a scintilla), that could convince a rational person that defendant was incompetent.

*Sisco v. State*, 599 S.W.2d at 613. If the trial court found any evidence of incompetence from any source, the *Sisco* decision required the trial court to submit the issue of defendant's trial-time competence to a jury. *Sisco v. State*, 599 S.W.2d at 610.

## C. WHAT KIND OF "EVIDENCE" DOES SECTION 2(b) PERMIT THE TRIAL COURT TO CONSIDER?

In making its decision whether to hold a hearing, the trial court can consider information that is not strictly evidence. Section 2(b) of article 46.02 states that the court is to consider "evidence" of the defendant's incompetence that comes to its attention "from any source." Tex.Code Crim.P.Ann. art. 46.02, sec. 2(b) (Vernon 1979); *see Garcia v. State*, 595 S.W.2d 538, 541 (Tex.Crim.App.1980). The Court of Criminal Appeals interprets the term "evidence" from section 2(b) broadly enough to encompass much more than just the evidence at the trial. *Id.* It includes the trial court's personal observations, evidence introduced during trial, any information known by the court, and information presented to the court by defendant, by his attorney's motion, or by affidavit of any reasonable or credible source. *Id.*

The issue here is what information the trial court should have considered in making its decision whether to hold a hearing on competence. Here is a summary of all the evidence on the issue.

### 1. *Appellant's condition on discharge from Rusk.*

Appellant is a chronic paranoid schizophrenic. His condition is permanent. Appellant was at Rusk for over two years before he responded to medication. When appellant was discharged from Rusk, he was still hearing voices, and the doctors considered his condition "guarded." Appellant was described at that time as well groomed. He was taking a daily 200 mg dose of Mellarill. Appellant was considered competent to stand trial.

### 2. *Appellant's condition before trial.*

In the two reports, each dated March 12, 1986, two doctors reported that appellant

was ill kempt and badly groomed. Both doctors reported that appellant had run out of medication. Dr. Brown noted that he was nervous and had trouble grasping the right word. Dr. Nottingham warned that if appellant's medication was not resumed, his mental condition would deteriorate. Both doctors concluded he was competent to stand trial. Although these reports were dated March 12, one was filed on April 1 and the other on July 11. No other doctors evaluated appellant's competence from March 12 to the time of trial on July 9.

### 3. Appellant's condition at the pre-trial hearing.

On the day of the trial, at the pre-trial hearing, appellant could not answer questions about the plea bargain agreement. The agreement was simple: Plea of nolo contendere for time served.

### 4. The defense counsel's unsworn motion for continuance.

The difficult issue is the last: Can we consider the unsworn statements about incompetence in appellant's motion for continuance? The majority says we cannot because there is no evidence the motion was brought to the attention of the trial court. I believe there are two issues here. First, can the trial court consider statements in an unsworn motion. Second, did appellant waive the issue of competence?

In the motion for continuance, defense counsel said he could not communicate with appellant and appellant could not assist in his defense. He believed appellant was over-medicated.

### a. Can the trial court consider statements in an unworn motion?

The law is unclear. In 1982, the Court of Criminal Appeals said the trial court could consider an unsworn statement of defense counsel to raise an issue about defendant's competence to stand trial. *Mata v. State*, 632 S.W.2d 355, 359 (Tex.Crim.App.1982).

The *Mata* court held that courts should not strictly interpret the term "evidence" in section 2(b). *Id.*

In 1984, the Court of Criminal Appeals held an unsworn statement by defense counsel was not "evidence" under article 46.02, § 4(a), and did not raise the issue of defendant's incompetence. *Green v. State*, 682 S.W.2d 271, 290–91 (Tex.Crim.App. 1984). The *Green* decision did not mention the *Mata* opinion. If we stopped at *Green*, we would assume the Court of Criminal Appeals reversed *Mata* without citing it.[1]

That, however, is not the end of the story. Two years later, the Court of Criminal Appeals refused to review the case of *Fannin v. State*, 715 S.W.2d 137 (Tex.App.—Dallas 1986, pet. ref'd). In *Fannin*, the Dallas Court of Appeals, relying on *Mata* as the law, held an unsworn statement by an attorney was "some evidence" under article 46.02, § 4(a). *Fannin*, 715 S.W.2d at 138. The Dallas court held the lawyer's statement raised the issue of competence even though a doctor reported defendant was competent. In its short, single-issue opinion, the Dallas court abated and remanded the case, relying on the attorney's unsworn statement. *Id.*

Because *Fannin* relied on *Mata* and the Court of Criminal Appeals refused petition for review in *Fannin*, a one-issue case, I believe the Court of Criminal Appeals stands behind *Mata*. If this analysis is correct, a lawyer's unsworn statements about his client's competence may raise the issue of competence.

### b. Can competence to stand trial be waived by failure to present a motion?

The majority holds that we do not need to consider the defense counsel's claim in the motion for continuance that appellant could not assist in his defense. The majority notes that nothing in the record shows that the defense counsel presented the motion to the trial court. The majority concludes appellant waived the matters stated

---

**1.** A review of Shepard's and Westlaw's Insta-Cite shows that no court has ever cited the *Green* opinion for the principle that the un-sworn statement of an attorney does not raise the issue of a defendant's competence to stand trial.

in the motion. I do not think appellant could waive the statements, and I think we must consider them.

In *Pate v. Robinson*, 383 U.S. 375, 384, 86 S.Ct. 836, 841, 15 L.Ed.2d 815 (1966), the State of Illinois argued that defendant waived his defense of competence to stand trial by not asking for a competence hearing, as required by law. The Supreme Court responded:

> It is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently "waive" his capacity to stand trial.

In *Ex parte Locklin*, 583 S.W.2d 787 (Tex.Crim.App.1979), the only document in the record alleging defendant was not competent was an affidavit filed by his sister before trial. As in *Pate*, the State argued that defendant waived his right to a separate trial on competency by failing to ask for one. The Court of Criminal Appeals said the waiver argument was answered in *Pate*, and quoted the above excerpt. 583 S.W.2d at 789.

In this case, defense counsel made and filed a motion in which he said appellant was not competent to stand trial. In *Pate* and *Ex parte Locklin*, the defense counsel did not even make a motion. Yet, the Supreme Court and the Court of Criminal Appeals held the defendants did not waive the issue. The majority here says, because there is no evidence it was *presented*, it was waived. I believe this holding is in conflict with *Pate* and *Ex parte Locklin*.

5. *The defense counsel's questioning of Dr. Fason during trial.*

The majority states: "Never once, during his direct or cross-examination, was Dr. Fason asked if he had an opinion about appellant's competency to stand trial." I disagree. Defense counsel twice asked Dr. Fason questions about appellant's sanity. The State objected both times, thus limiting Dr. Fason's testimony to crime-time sanity.

The defense counsel's questions to Dr. Fason and the State's response were:

> Defense: Based on your examination of these records and based on your physical examination, discussions with [appellant],

do you have any kind of medical conclusion that you can arrive at as to his sanity or insanity?

> The State: Your Honor, I object, unless it's specifically as to the time of the offense, January 9th, 1982.

> The Court: Sustain the objection.

> Defense: Based on your examination, have you found that [appellant] suffers from any mental disease, disorder, or defect of the mind?

> The State: Object to the question unless it's specifically as to January the 9th, 1982.

> Defense: We'll rephrase it. January 9th, 1982, disease, defect of the mind as of that date?

On this record, I do not believe we can say that the issue of appellant's trial-time competence was not broached with Dr. Fason.

D.  HOW DOES THE TRIAL COURT EVALUATE SECTION 2(b) "EVIDENCE"?

Going back to *Sisco*, the Court of Criminal Appeals told the trial court to consider only evidence that raised the issue of incompetence, and to ignore all evidence of competence in deciding whether to hold a hearing on competence. If we assume the *Sisco* "blinders" and examine just the evidence of incompetence (and exclude all evidence of competence), this record contains enough evidence to raise an issue of appellant's incompetence at the time of trial. Under this review of the record, the trial court must ignore the doctor's opinions that appellant was competent.

If we look at the evidence that raises the issue of incompetence (and ignore all evidence to the contrary), we find the following: Appellant is a chronic paranoid schizophrenic. It took the doctors at Rusk more than two years to bring his condition under control with medication. His condition is only stable if he has his medication. When appellant was discharged from Rusk he was still hearing voices, the doctors considered his condition "guarded," and he was taking 200 mg of Mellarill a day. In March, four months before trial, two doctors warned that appellant had run out of

medication while in the Harris County jail; one doctor said appellant's condition would deteriorate if the medication were not resumed. The defense counsel stated in a motion that appellant could not communicate with him or aid in his defense.[2] Defense counsel believed appellant could not communicate because he was over-medicated. At the pre-trial hearing, appellant could not answer simple questions about his understanding of the plea bargain agreement.

On this record and under the authority of Tex.Code Crim.P.Ann. art. 46.02 section 2 and *Sisco*, the trial court should have impaneled a jury on the issue of appellant's competence to stand trial.

### E. THE MAJORITY HOLDING ON TRIAL–TIME COMPETENCE.

In reaching its decision that it was not necessary to hold a jury trial on trial-time competence, the majority relies on the doctors' conclusion appellant was competent to stand trial, and ignores all other evidence. In analyzing the evidence of trial-time competence, the majority says:

> Although some of the factors analyzed in [the doctors' reports] might suggest appellant had a mental disorder, *these factors cannot be considered alone* and without reference to the doctors' medical conclusion.

At 305 [emphasis added]. That is exactly what *Sisco* tells us to do: The trial court *must consider* the evidence that shows incompetence to stand trial, and must ignore any evidence of competence. With the *Sisco* blinders in place, the court said, we are to see if there is any evidence, more than a scintilla, of incompetence. *Sisco v. State*, 599 S.W.2d at 613. If there is, the trial court must hold a jury hearing on the issue of defendant's trial-time competence.

When the majority considers the doctors' conclusion that appellant was competent on March 12, and ignores the evidence of appellant's trial-time incompetence (including the doctors' statements that appellant was out of medication), the majority violates the

principles of *Sisco*. I would find that the trial court should have submitted the issue of competence to a jury and sustain the first point of error.

## II. SHOULD THE TRIAL COURT HAVE INSTRUCTED THE JURY ON CRIME–TIME INSANITY?

In arriving at the decision that the trial court was not required to submit the issue of sanity at the time of trial, the majority again considers evidence we were told to ignore and ignores evidence we were told to consider.

Insanity was appellant's only defense to the State's indictment for murder. Both the prosecutor and defense counsel spent considerable time during voir dire telling the jury about the defense of insanity. Dr. Fason, appellant's only witness, testified about appellant's mental illness. After the close of the evidence, the trial court refused to submit the defensive issue of insanity.

Section 8.01(a) of the Texas Penal Code provides:

> It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong.

Tex.Penal Code Ann. § 8.01(a) (Vernon 1989).

If there was *any* evidence that raised the issue that appellant was insane at the time of the offense, the trial court should have submitted the sanity issue to the jury. *Arnold v. State*, 742 S.W.2d 10, 13 (Tex.Crim. App.1987). The Court of Criminal Appeals recently said defendant's sanity is not strictly a medical issue. *Pacheco v. State*, 757 S.W.2d 729, 735–36 (Tex.Crim.App. 1988). In *Pacheco*, the court said the circumstances of the crime itself are important in determining the mental state of the accused at the time of the crime. *Id.; see also Graham v. State*, 566 S.W.2d 941, 951 (Tex.Crim.App.1978). Even lay testimony, when considered with the facts of the case,

---

**2.** Even if the unsworn statements of defense counsel were not considered, the other evidence of incompetence was enough to raise the issue of incompetence.

may raise the issue of defendant's sanity. *Pacheco*, 757 S.W.2d at 736.

There is no presumption of sanity in Texas. *Madrid v. State*, 595 S.W.2d 106, 117 (Tex.Crim.App.1980) (op. on reh'g).[3] If a defendant wants to submit the affirmative defense of insanity, he has the burden to prove he was insane at the time of the offense by a preponderance of the evidence. A defendant does not battle a presumption of sanity; a defendant merely carries the burden of proof.

The majority does not identify which evidence it considered in making its decision on trial-time competence and which evidence it considered in making its decision on crime-time sanity. The evidence that may be considered for one inquiry is not necessarily admissible for the other inquiry.

For example, the majority considers the reports of the two doctors who concluded appellant was sane at the time of the offense. Neither report was introduced at trial.[4] Because the reports were not in evidence, the trial court could not consider them when it decided whether to submit the issue of sanity to the jury. The trial court could only consider the evidence about appellant's crime-time sanity that was in the record.

The issue for us is: Was there enough evidence in the record to raise the issue of appellant's insanity at the time of the offense? The only evidence in the record about crime-time sanity was the testimony of Dr. Fason. He testified appellant was a chronic paranoid schizophrenic on the day of the crime. When asked if appellant was insane at the time of the crime, he said he did not have enough information about his state of mind on that date. Dr. Fason said it was just as possible appellant was insane as sane on January 9, 1982. Without more evidence than the doctors had about appellant on that date, Dr. Fason said there was no way any doctor could tell whether appellant was psychotic when he shot Mr. Vallapando.

When appellant shot Mr. Vallapando, he was a chronic paranoid schizophrenic; that is, he was suffering from a permanent and serious mental disease with intermittent psychotic episodes. We must narrow our focus to the very moment appellant pulled the trigger: Is there evidence to raise the issue that *he did not know his conduct was wrong at that time?*

Appellant's murder of Mr. Vallapando was bizarre and unexplained. Evidence of a bizarre and unexplained crime alone, however, does not justify the submission of the defensive issue of insanity. Here, we add to the evidence of a bizarre and unexplained crime other factors: Appellant suffered from chronic paranoid schizophrenia, a permanent mental disorder that is genetically determined; the only psychiatric interviews were conducted long after the crime; and Dr. Fason said it was as likely appellant was sane as insane.

The majority states that Dr. Fason "did not disagree with the conclusions expressed by Dr. Brown and Dr. Nottingham that appellant was legally sane" at the time of the crime. I disagree with that reading of the record. Dr. Fason unequivocally testified that on January 9, 1982, the day of the crime, appellant had a mental disease or defect. Dr. Fason testified no one had enough information to be able to determine

---

3. In *Madrid,* the court said sanity is not a presumption; rather, insanity is an affirmative defense. As a legal concept, it is not correct to say that sanity is a "presumption." The State cannot draw a legal inference of sanity from the evidence. Defendant has the burden of establishing insanity. See Judge Dally's concurring opinion, 595 S.W.2d at 111, and Judge Clinton's dissent, 595 S.W.2d at 113–115, both of which were adopted by the court en banc. 595 S.W.2d at 117. The converse is also true: Once a person is adjudicated insane, the law assumes he is insane until the adjudication is vacated by a court order or defendant is officially discharged from the mental health facility. If there is no vacation of the adjudication of insanity (by court order or discharge), the State has the burden to establish sanity. In such a case, defendant does not have the benefit of a presumption of insanity.

4. Section 3(a) of article 46.03, Insanity Defense, provides that the court may appoint disinterested experts to examine the defendant with regard to the insanity defense and "to testify thereto at any trial or hearing on this issue." The State did not offer the testimony of either doctor.

if appellant was psychotic at the time of the crime. He agreed with Dr. Nottingham's report, which stated:

> Further, *there is no information at the time of the alleged offense* the subject was demonstrating a disease of the mind or a mental defect which would have interfered with his ability to appreciate the wrongfulness of such activity. [Emphasis added.]

Dr. Fason did not agree with Dr. Brown's conclusion that appellant was sane at the time of the crime. He interpreted Dr. Brown's report as saying "from the information now available" it did not appear appellant was suffering from a mental defect at the time of the crime. That was Dr. Fason's point: No one had enough information to determine appellant was sane at the moment he pulled the trigger.

The unexplained nature of the crime, along with all the other evidence, raised the issue of insanity by more than a scintilla of evidence. *See Pacheco,* 757 S.W.2d at 736. The facts immediately surrounding the offense, the entire absence of motive, together with defendant's history of mental problems, raised the issue of insanity at the time of the crime. *Epps v. State,* 10 S.W.2d 566, 567 (Tex.Crim.App.1928).

When the issue of insanity is thus raised, the trial court must submit the issue to the jury. I would hold the trial court should have submitted the issue of insanity at the time of the crime to the jury.

III. THE *ROSE* REMAND POINTS OF ERROR.

In overruling appellant's *Rose* points, the majority considered that the defense counsel discussed parole in his closing argument. This is the third time this Court has considered the effect of defense counsel's argument of parole, with different results each time. First, in *Urbano v. State,* 760 S.W.2d 33 (Tex.App.—Houston [1st Dist.] 1988, pet. ref'd), this Court held that defense counsel's argument on the parole charge was harmful. *Id.* at 39. Second, in *Gilliam v. State,* 766 S.W.2d 867 (Tex.App. —Houston [1st Dist.], 1989, n.p.h.), this Court held that the defense counsel's argu-

ment on parole was a waiver of the error. Third, in this case, the Court reaches yet another position: The defense did not waive the error but the error does not compel reversal. This Court explains its current position as a difference in facts, saying "each case must be analyzed on its individual facts." The legal system expects us to find similarities in the facts of the cases and apply the same principles to solve similar problems. The facts in these cases are similar enough to warrant similar treatment.

I would sustain all points of error and reverse this case for retrial.